**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Tito Juan PINO–PEREZ,
Defendant–Appellant.**

**No. 88–1507.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 1, 1988.
Reargued Feb. 9, 1989.
Decided March 10, 1989.

Richard J. Auerbach, Madison, Wis., for defendant-appellant.

Grant C. Johnson, Asst. U.S. Atty., Patrick J. Fiedler, U.S. Atty., Madison, Wis., for plaintiff-appellee.

Before BAUER, Chief Judge, CUMMINGS, WOOD, Jr., CUDAHY, POSNER, FLAUM, COFFEY, EASTERBROOK, RIPPLE, MANION, and KANNE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

POSNER, Circuit Judge.

■ We decided to hear this case en banc, pursuant to Circuit Rule 40(f), in order to decide whether violation of the federal "kingpin" statute, 21 U.S.C. § 848 (Continuing Criminal Enterprises, Title II, § 408, of the Organized Crime Control Act of 1970), is "an offense against the United States" within the meaning of the federal aider and abettor statute, 18 U.S.C. § 2(a). That statute provides: "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." A panel of this court had answered the question "yes" in *United States v. Ambrose,* 740 F.2d 505, 507–08 (7th Cir.1984), followed by a district judge in *United States v. Vasta,* 649 F.Supp. 974, 982 (S.D.N.Y.1986). Subsequently the Second Circuit, emphasizing legislative history not discussed in *Ambrose,* answered "no" in *United States v. Amen,* 831 F.2d 373, 381–82 (2d Cir.1987), followed in *United States v. Benevento,* 836 F.2d 60, 71–72 (2d Cir.1987). Oddly—when one considers that the kingpin statute has been on the books for almost twenty years—no other court has decided whether there can be liability for aiding and abetting a drug kingpin. The question is alluded to in *United States v. O'Connell,* 841 F.2d 1408, 1425 n. 9 (8th Cir.1988), but not decided.

A court of appeals has a responsibility to reexamine its decisions in light of new arguments, new evidence, new experience, especially when by doing so it may be able to eliminate a conflict between circuits and thereby lighten the Supreme Court's burden of resolving such conflicts. In that spirit we have undertaken to reexamine *Ambrose,* but having done so we adhere to our view that there is aider and abettor liability for assisting a kingpin.

The kingpin statute imposes heavy penalties for the commission of a felony narcotics violation as part of a continuing series of violations from which the perpetrator obtains substantial income or resources and which he conducts in concert with five or more persons with respect to whom he "occupies a position of organizer, a supervisory position, or any other position of management." 21 U.S.C. § 848(b)(2). (This section was renumbered to (d)(2)(A) pursuant to amendments made to the kingpin statute in 1986, but Pino–Perez was convicted under the original statute.) The minimum penalty is ten years in prison and the maximum is life in prison plus a $100,-000 fine (raised to $2 million in 1986). 21 U.S.C. § 848(a)(1). There is no parole, see § 848(c), although time off for good behavior and work in an industry or camp can cut the kingpin's sentence by more than a third. See 18 U.S.C. §§ 4161, 4162. The new federal sentencing statute enacted in 1986 abolishes parole for all federal crimes committed after its effective date (and time off for good behavior has also been trimmed), but when the kingpin statute was originally enacted its provision disallowing parole was unusual. Suspension and probation are also disallowed. See 21 U.S.C. § 848(c). Congress imposed a stiff minimum mandatory prison sentence—and meant it.

■ As the government has rightly conceded in these cases, the persons supervised by the kingpin cannot be punished as aiders and abettors. See *United States v. Ambrose, supra,* 740 F.2d at 507–08; *United States v. Amen, supra,* 831 F.2d at 381–82. When a "crime is so defined that participation by another is necessary to its commission," that other participant is not an aider and abettor. *United States v. Southard,* 700 F.2d 1, 20 (1st Cir.1983). "[B]y specifying the kind of individual who is to be found guilty when participating in a transaction necessarily involving one or more other persons, [the legislature] must not have intended to include the participation by others in the offense as a crime. This exception applies even though the statute was not intended to protect the other participants." *Id.* The exception covers persons whom a kingpin supervises.

If they were chargeable as his aiders and abettors, the purpose of the kingpin statute —to punish the kingpin more severely than other drug offenders—would be thwarted. Since the lowliest mixer, if punishable as an aider and abettor, would be subject to the same ten-year minimum as the kingpin himself, there would be no incremental deterrence of the kingpin in cases where the sentencing judge thought the statutory minimum adequate for the kingpin. Cf. *United States v. Farrar,* 281 U.S. 624, 50 S.Ct. 425, 74 L.Ed. 1078 (1930).

*Southard* describes two other exceptions to aider and abettor liability (see 700 F.2d at 19–20). The first concerns the victim of the crime. Even if, as in such crimes as extortion, blackmail, and bribery, his conduct significantly assisted in the commission of the crime, he cannot be charged as an aider and abettor. The second exception concerns members of a group that the criminal statute seeks to protect: a woman who is transported willingly across state lines for the purpose of prostitution cannot be charged as an aider and abettor of the transporter's Mann Act violation. *Gebardi v. United States,* 287 U.S. 112, 123, 53 S.Ct. 35, 38, 77 L.Ed. 206 (1932).

 Persons who assist a kingpin but are not supervised, managed, or organized by him do not fit any of these three exceptions, and we are reluctant to create a fourth. Cf. *United States v. Santore,* 290 F.2d 51, 76–78 (2d Cir.1960) (en banc). In *Ambrose,* the kingpin's aiders and abettors were police officers who protected the kingpin's operation. The role of the aider and abettor in *Amen,* Paradiso, is unclear from the Second Circuit's opinion; since the Second Circuit rejected aider and abettor liability, it had no reason to particularize Paradiso's activities. The government's brief in *Amen* describes Paradiso as "Abbamonte's [the kingpin's] trusted friend who assisted him in directing his distribution network from prison by arranging to punish one of his workers and by arranging for the acquisition of heroin. Without in any sense being employed or supervised by Abbamonte, Paradiso provided valuable assistance to the head of the network and his underlings." Brief for the United States of America in Nos. 87–1028 *et al. (United States v. Amen),* at p. 42. And *United States v. Vasta, supra,* a decision on pretrial motions in the same prosecution, reports the government's contention that the assistance of Paradiso and another alleged aider and abettor, Squitieri, "was of critical importance in keeping Abbamonte's operation alive." 649 F.Supp. at 982. Ernest A. Benevento, the person charged with aiding and abetting a kingpin in *United States v. Benevento, supra,* "engaged in managerial functions throughout J.E.M.'s drug operations [J.E.M. was an international criminal enterprise engaged in the manufacture and distribution of heroin] and provided substantial assistance to Ernesto J. Benevento [the kingpin. Ernest] ... provided J.E.M. with the use of his Arizona home for the drug manufacturing laboratory, maintained detailed financial records for the enterprise on his computer at home, contributed substantial amounts of capital to fund the second drug venture and attempted to smuggle currency out of the United States for J.E.M." 836 F.2d at 71. The aider and abettor in the present case, Pino–Perez, supplied cocaine to a drug ring in southern Wisconsin headed by Harold Nichols. Pino–Perez was *the* supplier to Nichols's enterprise, and the quantities supplied were impressive. Pino–Perez once received $30,000 in cash for two kilograms of cocaine that he sold to the Nichols enterprise. He sold the enterprise as much as five kilograms at a time, and planned a final sale of 20 kilograms to it. His sales were frequent, and they continued for a long time. He claimed to know all or at least most of the big cocaine dealers in the country. This may have been *braggadoccio,* but there is no question that he was a big dealer—much bigger than Nichols, the kingpin.

The judge sentenced Pino–Perez to 40 years in prison under the kingpin statute for aiding and abetting Nichols's enterprise. Besides asking us to overrule *Ambrose,* Pino–Perez contends that the trial demonstrated either a fatal variance between the indictment and the proof or a "constructive" amendment of the indict-

ment. This contention has no possible merit and requires no discussion. See *United States v. Leibowitz,* 857 F.2d 373, 378–79 (7th Cir.1988). His remaining contentions are equally meritless, so we may turn to the issue of aider and abettor liability.

What is now section 2(a) of the federal criminal code dates back to 1909. See Act of March 4, 1909, ch. 321, § 332, 35 Stat. 1152; *Standefer v. United States,* 447 U.S. 10, 15–20, 100 S.Ct. 1999, 2003–06, 64 L.Ed. 2d 689 (1980). Ever since then, every time Congress has passed a new criminal statute the aider and abettor provision has automatically kicked in and made the aiders and abettors of violations of the new statute punishable as principals. "With the enactment of that section [the 1909 predecessor to section 2(a)], all participants in conduct violating a federal statute are 'principals.'" *Id.* at 20, 100 S.Ct. at 2006 (dictum). "The aiding and abetting provision [section 2(a)] ... is applicable to the entire criminal code." *United States v. Jones,* 678 F.2d 102, 105 (9th Cir.1982). To the same effect, see, e.g., *United States v. Sopczak,* 742 F.2d 1119, 1121 (8th Cir.1984) (per curiam); *United States v. Rector,* 538 F.2d 223 (8th Cir.1976) (per curiam). No cases other than *Amen* and *Benevento* hold section 2(a) totally inapplicable to a federal criminal statute. Not every accomplice in the commission of a federal criminal offense is an aider and abettor, but until *Amen* every aider and abettor of a federal criminal offense had been thought punishable for the offense as a principal by virtue of section 2(a). The prostitute transported across state lines is not an aider and abettor of a Mann Act violation, but a supplier of prostitutes to the transporter may be (depending on what he knows—more on this shortly), and he is therefore punishable by virtue of section 2(a) as a principal violator of the Mann Act. *United States v. Simmons,* 610 F.Supp. 295, 304 (M.D.Tenn.1984). The kingpin's employees are not aiders and abettors, but—one might have thought— the supplier of the kingpin's drugs may be.

In reaching a contrary conclusion, *Amen* relied primarily on the legislative history of the kingpin statute. Early versions of the bill that became section 848 were sentence-enhancement provisions under which if a defendant was convicted of a drug offense (such as manufacture, distribution, or possession with intent to distribute, see 18 U.S.C. § 841(a)(1)), the prosecutor would have been allowed to argue to the sentencing judge that the defendant should be punished more heavily than usual because he was a drug kingpin. See H.R.Rep. No. 1444, 91st Cong., 2d Sess. 80–84 (1970) U.S. Code Cong. & Admin.News 1970 pp. 4566, 4648, 4652 (additional views of four Congressmen). If the sentence-enhancement format had been retained in section 848 as enacted, there would have been no aider and abettor liability for assisting a kingpin, because there would have been no kingpin offense; there would just have been kingpin offenders against other criminal statutes. But it was not retained. In response to objections that in a sentencing hearing the defendant would not be able to cross-examine those who had accused him of being a kingpin, the bill was amended to make "engagement in a continuing criminal enterprise a new and distinct offense with all its elements triable in court." *Id.* at 84. From this history the Second Circuit concluded in *Amen* that "while the legislative history makes no mention of aiders and abettors, it makes it clear that the purpose of making CCE [Continuing Criminal Enterprises—the official name of the kingpin statute] a new offense rather than leaving it as sentence enhancement was not to catch in the CCE net those who aided and abetted the supervisors' activities, but to correct its possible constitutional defects by making the elements of the CCE triable before a jury." 831 F.2d at 382. To this we cannot say "amen." True, it was not Congress's *purpose* in making the operation of a continuing criminal enterprise a separate offense to bring section 2(a) into play. But such is never Congress's purpose in creating a new offense. Congress doesn't have to think about aider and abettor liability when it passes a new criminal statute, because section 2(a) attaches automatically. The question is not whether section 2(a) is applicable—it always is. The

question is whether a given accomplice is an aider and abettor. The statute, here the kingpin statute, is used to determine who counts as an aider and abettor, for the term is not defined by section 2(a). But once that determination is made, liability is automatic by virtue of section 2(a).

It would introduce great uncertainty into federal criminal law if the liability of a conceded aider and abettor depended on the results of an inquiry into Congress's intent concerning such liability in creating the offense that the defendant aided and abetted. Yet that is the inquiry required by *Amen*. The passage we have quoted could even be interpreted to mean that unless a specific intent to punish aiders and abettors appears in the legislative history of a criminal statute, section 2(a) does not apply to that statute; aiding and abetting violations of the statute is not a crime. That approach would essentially abolish federal aider and abettor liability. A more modest version of the approach would require the kind of inquiry that the Supreme Court uses to decide whether a regulatory statute that is silent on private rights of action can be enforced by them: it asks "whether Congress, either expressly or by implication, intended to create a private right of action." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 576, 99 S.Ct. 2479, 2489, 61 L.Ed.2d 82 (1979). Until *Amen* the presumption with regard to aiding and abetting had been different. There had to be " 'an affirmative legislative policy' to create an exemption from the ordinary rules of accessorial liability." *United States v. Falletta*, 523 F.2d 1198, 1200 (5th Cir.1975), quoting *Gebardi v. United States, supra*, 287 U.S. at 123, 53 S.Ct. at 38. Doubt about Congress's intentions was resolved in favor of aider and abettor liability.

The opinion in *Amen* gives the impression that the conversion of the kingpin statute from a sentence-enhancement provision to a provision creating a new and distinct offense was an unconsidered last-minute switch. That is not correct. The Dingell Amendment (which brought about the switch) was debated extensively; what is more, the sentence-enhancement provision was ultimately restored to another provision of Title II of the omnibus act. See 21 U.S.C. § 849 (dangerous special drug offender sentencing). The full story is told in *Garrett v. United States*, 471 U.S. 773, 780–85, 105 S.Ct. 2407, 2412–15, 85 L.Ed.2d 764 (1985). The new and distinct offense created by section 848 was more fully debated than most federal criminal statutes, and there is no more reason to infer from its legislative history an intent to preclude aider and abettor liability than there would be to draw such an inference from the legislative history of any other federal criminal statute. The three exceptions recognized in *Southard* exhaust the cases in which an inference can confidently be drawn that Congress in enacting a criminal statute meant to protect a class of accomplices from being charged as aiders and abettors.

Besides legislative history, *Amen* emphasizes practical objections to aider and abettor liability in kingpin cases. "How does one determine whether a person is an employee [of the kingpin, and hence not an aider and abettor] or third party? What of the businessman who leases a boat to a CCE engaged in importation? What about the kingpin's bodyguard? Or his lawyer?" 831 F.2d at 382. These are legitimate rhetorical questions, and they can be multiplied. If there is aider and abettor liability in kingpin cases, could not assistants outside the organization be deemed aiders and abettors and be punished more severely than important operatives within the organization? And would not assistants with roles in two or more organizations be simultaneously covered and excluded? Suppose the main supplier to a distribution network in Wisconsin was the henchman of a larger network in Colombia that had subsidiaries in Florida. If the government prosecuted the Colombia or Florida operations, their operatives could not be convicted as aiders and abettors, because they would be subordinates; but if the government prosecuted only the Wisconsin operation, a member of the Florida organization could be convicted because he was *not* a subordinate of the Wisconsin kingpin. Indeed, someone charged as an aider and

abettor of a kingpin might feel impelled to show that he was really one of the kingpin's employees—which would get him out of the section 848 frying pan but land him in a section 841 fire. And the supplier of a small quantity of drugs to a kingpin—a quantity too small to permit severe punishment under section 841—would, if liable as an aider and abettor of the kingpin, be severely punishable under section 848. See 21 U.S.C. § 841(b).

These rhetorical questions and classroom-type hypotheticals sound more ominous than they are. (The absence of any litigation over the issue of *which* accomplices of a drug kingpin are aiders and abettors provides some reassurance on this score.) Let us consider each of them. The lessor of the boat would be an aider and abettor of the kingpin—provided he met the requirements for an aider and abettor. This is an important qualification and it undercuts *Amen*'s position. We and other courts have endorsed Judge Learned Hand's definition of aiding and abetting, which requires that the alleged aider and abettor "in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed." *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir.1938); see *United States v. Fountain*, 768 F.2d 790, 797–98 (7th Cir. 1985); *United States v. Ambrose, supra*, 740 F.2d at 509, and cases cited there; also *Bosco v. Serhant*, 836 F.2d 271, 279 (7th Cir.1987); *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir.1977). The venture in a kingpin case is, of course, the continuing criminal enterprise. It is *that* enterprise which the boat lessor in *Amen*'s example would have to be found to have associated with, participated in, and sought by his action to make succeed, in order to be punishable as an aider and abettor. The mere fact of leasing a boat to a person known to be a drug trafficker would not be enough to make him guilty of aiding and abetting a drug kingpin. And so with the last hypothetical as well. One who sells a small—or for that matter a large-quantity of drugs to a kingpin is not by virtue of the sale alone an aider and abettor. It depends on what he knows and what he wants: Does he want the kingpin's enterprise to succeed or is the kingpin just another customer? If he does want the enterprise to succeed, there is no anomaly in holding him liable as an aider and abettor. Instead of buying from one large supplier (Pino–Perez), kingpin Nichols might have decided to buy from a host of small suppliers. If they knew he was a kingpin, associated themselves with his enterprise, participated in it as something they wanted to see succeed, and by their action sought to make it succeed, then they would indeed be punishable as aiders and abettors—and rightly so. The application of the *Peoni* test will sometimes require difficult factual appraisals, but the paucity of reported cases suggests that the factfinding task is a manageable one.

The bodyguard mentioned in *Amen* would presumably be a person supervised by the kingpin, hence not an aider and abettor. A lawyer is of course not an aider and abettor of his clients, whether or not he fits the *Peoni* definition; this is merely a commentary on the limitations of definition. A drug dealer could be both the underling of one kingpin and the aider and abettor of another. Cf. *United States v. Bond*, 847 F.2d 1233, 1236–37 (7th Cir. 1988). So much the worse for him; he need not be the top man to be convicted of the kingpin offense. We so held in *United States v. Moya–Gomez*, 860 F.2d 706, 745–49 (7th Cir.1988); see also *United States v. Becton*, 751 F.2d 250, 254–55 (8th Cir.1984), and other decisions cited in *Moya–Gomez, supra*, at 746. For all we know, Pino–Perez is the employee of some superkingpin. He could not be convicted of aiding and abetting *that* kingpin, but so what? Granted, it may sometimes be to the advantage of one accused of being a kingpin's aider and abettor to inculpate himself as an underling; but nothing is more common than for a criminal defendant to seek to exculpate himself of a major offense by accusing himself of a lesser one.

Finally, it is unlikely that important operatives of a drug kingpin would be punished less severely than less important aiders

and abettors. Kingpins are not limited to heads of organizations; a kingpin is anyone who has supervisory or managerial responsibility with regard to five or more members of the organization. A large organization will contain more than one person with such supervisory responsibilities. In *United States v. Rosenthal*, 793 F.2d 1214, 1225–26 (11th Cir.1986), both the boss of the enterprise and one of his foremen were convicted of the kingpin offense. Even Nichols's relatively modest enterprise had two "managers," besides himself. Moreover, drug underlings are subject to punishment under section 841, which has its own severe minimum penalties. And, on the other hand, not every accessory is an aider and abettor; as Judge Hand's definition and the history of section 2(a) show, an accessory after the fact is not an aider and abettor. See, e.g., *Bollenbach v. United States*, 326 U.S. 607, 611, 66 S.Ct. 402, 404–05, 90 L.Ed. 350 (1946); *United States v. Varelli*, 407 F.2d 735, 749 (7th Cir.1969); *United States v. Covelli*, 738 F.2d 847, 860 n. 18 (7th Cir.1984); S.Rep. No. 10, 60th Cong., 1st Sess. 13 (1908). This is another reason to believe that aider and abettor liability will not create an anomalous pattern in which the more culpable are let off more lightly than the less culpable.

■ The remaining objection to aider and abettor liability in kingpin cases (surprisingly not mentioned in *Amen* even though it had greatly troubled this court in *Ambrose*) arises from the heavy minimum penalty that the kingpin statute imposes. The least culpable kingpin is to be punished by at least ten years in prison with no possibility of parole. Since an aider and abettor is punishable as a principal—that is, punishable under the statute creating the offense that he was found to have aided and abetted—the least culpable aider and abettor of a kingpin must likewise be punished by no less than ten years in prison with no possibility of parole. This is a harsh result, and while it did not persuade us in *Ambrose* that there is no aider and abettor liability in kingpin cases, it did persuade us that section 2(a) authorizes the sentencing judge to disregard the minimum penalty in section 848. 740 F.2d at 508–10.

We pointed out that the concept of aiding and abetting had come into the law at a time when all felonies carried the death penalty, and had been welcomed as a device for enabling the lesser participants in a felony to be punished more leniently than by death. See 4 Blackstone, Commentaries on the Laws of England 39 (1769); Perkins, *Parties to Crimes*, 89 U.Pa.L.Rev. 581, 613–15 (1941). As judges acquired more and more sentencing discretion, the felt need to distinguish between principals on the one hand and aiders and abettors on the other in order to mitigate the severity of criminal punishment diminished, and the distinction was eventually discarded, as in section 2(a).

The historic purpose of aiding and abetting liability coexists uneasily with criminal offenses that carry mandatory minimum penalties, such as the kingpin statute. We said in *Ambrose* that "a policeman who took an isolated bribe from a kingpin but did not engage in a prolonged and systematic protection racket, as these defendants did, would still be an aider and abettor of the kingpin, and therefore under the view that the aiding and abetting statute mechanically incorporates the whole punishment schedule of section 848 would have to be sentenced to a minimum of 10 years in prison without possibility of parole. Yet if there were no minimum the judge might sentence the policeman to only two or three years in prison and the policeman would be eligible for parole after serving a third of that time." 740 F.2d at 509. We therefore held that in sentencing a kingpin's aider and abettor the judge was not bound by the minimum penalty provisions of the kingpin statute. Judge Wood dissented from this holding. See *id.* at 513–16.

Further reflection has convinced us that Judge Wood's position is correct. Three reasons are decisive. *First*, section 2(a) does not contain its own schedule of punishments but instead makes the aider and abettor punishable *as a principal* for the offense that he aided and abetted. That is, punishment is imposed under the statute creating that offense. Here that is the kingpin statute, which imposes a minimum

penalty applicable to everyone punishable under the statute—and an aider and abettor is punishable under the statute creating the offense he has aided and abetted and under no other statute. We recognize, not disapprovingly, that judges engage in a certain amount of statutory revision, especially when dealing with two statutes that were passed at different times without explicit reference to each other and that don't fit together nicely. But simply lopping off a minimum statutory penalty for one class of violators (aiders and abettors) now strikes us, as it did Judge Wood back in 1984, as exceeding the prudent bounds of judicial creativity.

*Second,* while endorsing Judge Hand's definition of aider and abettor *Ambrose* paid insufficient heed to the limitations built into it. "A policeman who took an isolated bribe from a kingpin" would not be likely to be convicted of aiding and abetting the kingpin's violations—would not be likely even to know he was dealing with a kingpin. Aiding and abetting implies a fuller engagement with the kingpin's activities. *Third,* and related, in no reported case has the participation of the aider and abettor been so meager relative to the kingpin's that subjecting him to the minimum penalty in the kingpin statute would be savage or incongruous. The "Marquette 10"—the corrupt policemen who protected the kingpin in *Ambrose*—were not small fry, and of course neither is Pino-Perez—he was a *bigger* drug dealer than Nichols, the kingpin, whom he supplied. Paradiso, the aider and abettor in *Amen,* was not a small fry either; we know because he was sentenced not to the statutory minimum but to 40 years, of which 20 were for aiding and abetting the kingpin. Squitieri's role was apparently a large one too, as was Ernest A. Benevento's role in assisting the kingpin in *United States v. Benevento.* Experience since *Ambrose* teaches that the danger which concerned us in that case—the danger that ferocious mandatory minimum sentences might be meted out to minor accomplices—is, as a practical matter, insufficiently serious to warrant so athletic an exercise in interpretive creativity as attempted in that case, let

alone the casting of a cloud of uncertainty over all federal aider and abettor liability, as in *Amen.*

Congress may want to give attention to the problem of subjecting aiders and abettors to stiff mandatory minimum criminal penalties, although we recognize both that lenity for drug offenders is not high on the current list of national priorities and that, as illustrated by *United States v. Martinez-Zayas,* 857 F.2d 122, 131–33 (3d Cir. 1988), a drug dealer who might be convicted as a kingpin's aider and abettor is quite likely to be punishable in any event under provisions of section 841 that themselves carry heavy mandatory minimum penalties. (Not all aiders and abettors of drug kingpins are themselves drug dealers, however, as illustrated by *Ambrose.*) But we think that both the aider and abettor statute and the kingpin statute mean what they say. If the mesh between them is imperfect—which it is—still the judicial cure that we attempted in *Ambrose,* and the even more drastic cure that our respected colleagues in the Second Circuit attempted in *Amen,* are, we believe, even worse than the disease.

AFFIRMED.

EASTERBROOK, Circuit Judge, with whom CUDAHY and MANION, Circuit Judges, join, dissenting with respect to the aiding and abetting conviction but otherwise concurring.

We held in *United States v. Ambrose,* 740 F.2d 505 (7th Cir.1984), that a person who aids and abets a criminal "kingpin" may be punished under the Continuing Criminal Enterprise ("CCE") statute, 21 U.S.C. § 848. The argument for this conclusion is simple. "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C. § 2(a). The CCE statute establishes "an offense against the United States", and Pino-Perez aided and abetted the commission of that offense. He is therefore "punishable as a principal." Aides do not satisfy the five-supervised-persons requirement of the CCE statute,

but § 2(a) may apply even when the assistant could not have committed the principal offense. E.g., *Standefer v. United States*, 447 U.S. 10, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980) (a private person may be convicted under § 2(a) for abetting a violation of 26 U.S.C. § 7214(a)(2), which makes it a crime for an officer of the United States to take a bribe in the course of executing the revenue laws).

The task of interpretation is not quite so straightforward, though, for several reasons.

- Section 848 imposes a minimum term of ten years' imprisonment and a maximum of life, all without possibility of parole. The term was set so high because the statute condemns only managers who supervise at least five others for extended periods. Liability for aiding and abetting sweeps up persons who supervise no one. This led us to hold in *Ambrose* that the judge need not adhere to the minimum-sentence provisions of § 848 when sentencing aiders and abettors. 740 F.2d at 508–10. The court abandons that limitation today as unsupportable, with the result that the aider and abettor faces the kingpin's minimum term although his role may be far less significant than the kingpin's.
- Suppliers, such as Pino–Perez, are among the enterprise's aiders and abettors. Section 841 addresses suppliers in detail. If the defendant sells five or more kilograms of cocaine, then the penalties under §§ 841 and 846 are the same as those under the CCE statute, see 21 U.S.C. § 841(b)(1)(A)(ii). If the defendant sells between 0.5 and 5.0 kilograms, the penalties are lower, § 841(b)(1)(B)(ii). Smaller amounts yield still smaller sanctions, § 841(b)(1)(C). See *United States v. Martinez–Zayas*, 857 F.2d 122, 127–32 (3d Cir.1988). To treat an aider and abettor as a kingpin on the authority of § 2(a) is to demolish the graduated structure of penalties under § 841.

- Employees of an organization aid and abet their boss. The CCE statute authorizes higher punishment for higher-ups. Only a person who supervises five or more others is a kingpin. It would be absurd to treat lords and vassals identically under the CCE law on the ground that vassals lend aid and assistance; the structure of the CCE statute is set against it. *Ambrose* therefore added an element, which the court today reaffirms: "the persons supervised by the kingpin cannot be punished as aiders and abettors", Maj. op. at 1231.
- The addition of this extra-statutory element has the potential to create a crazy-quilt pattern of liability. Assistants outside the organization may be called aiders and abettors, receiving higher punishment than more important operatives within the organization. Assistants with roles in two or more organizations may be both covered and excluded. Pino–Perez undoubtedly is such a person. (No one supposes that he tended and harvested the plants, refined the cocaine, smuggled and transported the drug himself.)
- The extra element could put the defendant in a pickle if he really is a subordinate of the kingpin, but the prosecutor omits him from the list of those the kingpin is charged with supervising. The only defense to the charge of aiding and abetting the CCE offense might be to paint oneself as a henchman of the person charged as the kingpin, which greatly enhances the possibility of conviction on other charges. Anyway, why should liability depend on whether the prosecutor *claims* that the aider and abettor is not in the chain of command of the criminal organization? Are all but five of the criminal enterprise's couriers to be convicted as aiders and abettors and sentenced under the CCE statute?

These difficulties show that statutory texts cannot dispose of the case. To follow the

language of 18 U.S.C. § 2(a) is to require at least one addition to the equally plain language of 21 U.S.C. § 848 and to do substantial damage to the exquisitely clear language of 21 U.S.C. § 841 establishing a scale of punishment graduated by amounts sold.

If § 2(a) traditionally were read woodenly, that would be that, for the CCE statute must be understood against the interpretation § 2(a) had when Congress acted. But § 2(a) has never been applied mechanically; its scope depends on the structure and functions of the substantive statute. See *United States v. Farrar*, 281 U.S. 624, 50 S.Ct. 425, 74 L.Ed. 1078 (1930), implying that purchasers of liquor from a bootlegger are not liable as aiders and abettors because Congress meant to limit liability to sellers, and *Gebardi v. United States*, 287 U.S. 112, 53 S.Ct. 35, 77 L.Ed. 206 (1932), holding that prostitutes may not be convicted as aiders and abettors of the Mann Act offense, because that law requires the prosecutor to show that the defendant transported prostitutes across state lines, implicitly establishing a difference in culpability between the organizer and the prostitute. When the structure of the main offense speaks to the scope of accessorial liability, *Gebardi* tells us, § 2(a) ought not be taken literally. Indeed, the court today refuses to take § 2(a) literally, for it says that the kingpin's subordinates may not be convicted as aiders and abettors. To curb the worst effects of punishing casual hangers-on and minor assistants under the draconian terms of § 848, the court adds that a person may be convicted under § 2(a) only if he "want[s] the kingpin's enterprise to succeed", maj. op. at 1235—a novel mental element that can't be located in the text or history of either § 2(a) or § 848. So the only question is the *extent* to which we must depart from literal implementation to make the statutes work together. On this question, the legislative history is suggestive.

The legislative proposals that led to § 848 did not start with suggestions for a new criminal law. Congress was dissatisfied with the penalties being imposed on higher-ups in drug-peddling organizations.

This led to proposals to enhance the sentences of those so convicted. The first versions of what became § 848 were sentence-enhancement provisions. If the defendant were convicted of a drug offense, the prosecutor would be allowed to argue to the sentencing judge that the defendant was a kingpin (a perpetrator of a "pattern of conduct"), authorizing extra punishment. *United States v. Amen*, 831 F.2d 373, 381–82 (2d Cir.1987), reports what happened next:

> The Association of the Bar of the City of New York and others objected that these provisions allowed sentencing to be imposed without providing a defendant with an opportunity to cross-examine persons providing information as to the continuing criminal offense. [H.R.Rep. 91–1444, 91st Cong., 2d Sess., 1970 U.S. Code Cong. & Admin.News] at 4650–51. An amendment offered by Representative John D. Dingel and adopted by the Interstate and Foreign Commerce Committee corrected the defects in the original sentencing bill. "Instead of providing a post-conviction-presentencing procedure, it made engagement in a continuing criminal enterprise a new and distinct offense with all its elements triable in court." *Id.* at 4651....
>
> While the legislative history makes no mention of aiders and abettors, it makes it clear that the purpose of making CCE a new offense rather than leaving it as sentence enhancement was not to catch in the CCE net those who aided and abetted the supervisors' activities, but to correct its possible constitutional defects by making the elements of the CCE triable before a jury.

*Amen* presents the history of the bill in the House. The Conference Committee accepted the House version of the CCE provision with only technical changes, so that the history in the House turns out to be the only important history. See H.R.Conf.Rep. No. 91–1603, 91st Cong., 2d Sess., 1970 U.S.Code Cong. & Admin.News at 4657. On the other side one might point to a comment in the Senate Report that to be culpable under the CCE statute the "defen-

dant must have occupied a position of organizer or assumed a management role such as a hit man", S.Rep. 91–613, 91st Cong., 1st Sess. 28 (1969), which suggests that important operatives of the venture may be convicted. But the Senate Report does not tie this comment to the language of the statute, which requires supervision, and as we have emphasized the transformation in the House is what matters, given that the Conference Committee adopted the House's language.

Section 848 became a substantive statute only in order to afford defendants greater procedural rights than a sentence-enhancement statute would have done. Nothing in the debates leading to this conversion suggests that any Member of Congress wanted to enlarge the liability of hired hands, suppliers, or other aiders and abettors, or contemplated that § 848 would produce this result.

Legislative contemplation is of course not a condition to the application of § 2(a), which comes into play whenever Congress defines a substantive crime. "It is not the law that a statute can have no effects which are not explicitly mentioned in its legislative history". *Pittston Coal Group v. Sebben,* — U.S. —, 109 S.Ct. 414, 420–21, 102 L.Ed.2d 408 (1988). So if we were prepared to hold that § 2(a) applies to § 848 in the way it applies to any other crime, then we might dismiss the evolution of § 848 as irrelevant. Yet it is common ground among members of the court that the structure and function of § 848 matter —that is why the majority holds that the kingpin's subordinates cannot be aiders and abettors, why it emphasizes that only those who "want the kingpin's enterprise to succeed", maj. op. at 1235, may be convicted under § 2(a). The majority's slippery slope argument—that once we start looking at the structure and history of the CCE statute, certainty is lost—does not carry the day when the majority does what it decries: it uses the structure of § 848, and the purposes ascribed to Congress, to cut back on the scope of § 2(a). Once we enter the business of reading the structure and functions of § 848, how § 848 came to its current form and how aiding-and-abetting lia-

bility undercuts the limitations of § 841 become important. The debates show Congress in a savage mood, no doubt, but its wrath had a specific object. See also *Garrett v. United States,* 471 U.S. 773, 781, 105 S.Ct. 2407, 2413, 85 L.Ed.2d 764 (1985) (the CCE statute is "a carefully crafted prohibition aimed at a special problem. [It] is designed to reach the 'top brass' in the drug rings, not the lieutenants and foot soldiers"). The concern of the legislature lay in its desire to create mandatory minimum (and life maximum) penalties for the *doyens* of drugs, not in achieving increases in the sentences of *aides-de-camp.*

My colleagues imply that they have not really cut back on the scope of § 2(a) by preventing its application to a kingpin's subordinates. They treat *Gebardi* as holding that when an accomplice's action is part of the definition of the offense, he is not an aider and abettor, see *United States v. Southard,* 700 F.2d 1, 20 (1st Cir.1983), and say that they have enforced the full scope of § 2(a) as so read, maj. op. at 1231. That interpretation cannot account for *Standefer,* which holds that the payor of a bribe may be convicted of aiding and abetting the receipt of that bribe, although the payor's role is an essential element of the recipient's crime. As for the Mann Act: interstate transportation of prostitutes is unlawful, and *Gebardi,* treating prostitutes as victims, holds that they may not be convicted of aiding or abetting their own transportation. The kingpin's subordinates are not victims; § 848 was not enacted for their protection. The court excludes the subordinates not because *Gebardi* compels this but because it believes that otherwise "the *purpose of the kingpin statute*—to punish the kingpin more severely than other drug offenders—would be thwarted", maj. op. at 1232 (emphasis added). Decisions based on structure and purpose ought to be based on the whole structure and all of the purposes.

Forced to choose between damage to the language of § 2(a) (by having no aiding and abetting liability) and damage to the language and structure of both § 848 (by adding new elements for aiders and abettors) and § 841 (by eliminating the gradation of

penalty by the amount of drugs supplied), we should preserve as much as possible of §§ 841 and 848. Suppliers come within 21 U.S.C. §§ 841 and 846, which read directly on their conduct and are no more lenient for big sellers than § 848 is for big cheeses. Pino–Perez, a wholesaler, was sentenced to 40 years' imprisonment without parole under § 846 and § 841, concurrent with the CCE sentence except for a $50 special assessment. When the supplier runs a delivery organization of his own, then he too faces prosecution under the CCE statute. See *United States v. Bond*, 847 F.2d 1233 (7th Cir.1988) (CCE conviction, as a principal, of one situated similarly to Pino–Perez). A prosecutor need not choose whichever statute is most favorable to the accused. *United States v. Batchelder*, 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979). But the prosecutor must find a statute that is applicable, and the interplay among provisions helps us to know a statute's domain. The CCE statute covers suppliers only if they have organizations over which to reign. A prosecutor who wants a mandatory minimum sentence or a life maximum should not be allowed to evade the need to prove the defendant's supervisory role under § 848 or the quantity of drugs involved under § 841.

CUDAHY, Circuit Judge, dissenting in part:

I join fully in the dissenting opinion of Judge Easterbrook as to the inapplicability of section 2(a) in this case. The Continuing Criminal Enterprise statute, 21 U.S.C. § 848, is aimed at defendants occupying a particular status, that of "kingpin," and application of the aiding and abetting provision makes little sense in this setting.

I write separately to address the problem that occupied most of the defendant's brief, and which has been dealt with summarily by the majority: whether changes between the indictment and the proof at trial varied or amended the indictment in this case. This court addresses many claims that we conclude to be without merit; it has been our custom to state some reason for our conclusions, even if the reasoning can be summarized in a sentence or two. This procedure seems basic in most cases to the legitimacy of the system.[1]

In this case Pino–Perez complains that because a key government witness became unavailable, the government's proof at trial on two of the counts of the indictment pertained to completely different transactions than those forming the original basis for these counts as brought in by the grand jury.[2] This presents a somewhat different situation from the more usual variance problem, in which the incident alleged in the indictment and proved at trial are the same, but the original date alleged in the indictment was incorrect. *See U.S. v. Leibowitz*, 857 F.2d 373 (7th Cir.1988). While some inaccuracy as to dates is clearly permissible, *Ledbetter v. United States*, 170 U.S. 606, 18 S.Ct. 774, 42 L.Ed. 1162 (1898), the government is not permitted to generate new grounds for counts of an indictment when witnesses become unavailable or new crimes come to light. *See Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). However, in this case, we cannot say with certainty that this is what has happened because there was no bill of particulars from which to ascertain exactly which incidents are alleged in each count of the indictment. The proof at trial seems adequate under the language of the grand jury indictments, although the circumstances strongly suggest that the defendant's argument is not frivolous.

1. *See, e.g.,* T. Tyler, *Why People Follow the Law: Procedural Justice, Legitimacy, and Compliance* (1989).

2. Specifically, Count XI was apparently based on an incident, involving only Pino–Perez and Nichols, that Nichols reported as having occurred on or about November 17. Count IX had apparently been based upon an incident involving a witness, Janet Rains, who testified only that the transaction had occurred "in the winter months." At trial the government used the Rains transaction as proof of Count XI, and introduced a wholly new incident not mentioned in Nichols' original report (a transaction involving witness Larry Chapel) as proof on Count IX.