In the
United States Court of Appeals
For the Seventh Circuit

Nos.  98-2600, 98-2820, 98-2915, 98-3433,
98-3840, 99-1377, 99-2142 & 00-2520

United States of America,

Plaintiff-Appellee,

v.

Larry Hoover, Tirenzy Wilson, Gregory Shell,
Jerry Strawhorn, Adrian Bradd, Darrell Branch,
Andrew Howard, and William Edwards,

Defendants-Appellants.


Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 95 CR 508--Harry D. Leinenweber, Judge.


Argued March 2, 2001--Decided April 12, 2001


  Before Cudahy, Easterbrook, and Rovner, Circuit
Judges.

  Easterbrook, Circuit Judge. The Gangster Disciples,
a large and vicious street gang, sells great
quantities of cocaine, heroin, and other drugs in
Chicago. A series of cases has seen the
conviction of many members, some of them high in
its hierarchy. See United States v. Ray, 238 F.3d
828 (7th Cir. 2001); United States v. Wilson, 237
F.3d 827 (7th Cir. 2001); United States v.
Johnson, 223 F.3d 665 (7th Cir. 2000); United
States v. Smith, 223 F.3d 554 (7th Cir. 2000);
United States v. Jackson, 207 F.3d 910 (7th Cir.
2000), remanded, 121 S. Ct. 376 (2000), decision
on remand, 236 F.3d 886 (7th Cir. 2001); United
States v. Irwin, 149 F.3d 565 (7th Cir. 1998).
Today we deal with eight more members of the
organization, including Larry Hoover, its
"chairman of the board"; Gregory Shell, Hoover's
second in command; Andrew Howard, the third of
the gang's "directors"; and two "governors"
(Tirenzy Wilson and Jerry Strawhorn). The other
three appellants were lower in the hierarchy but
still deeply involved in its operations. The five
directors and governors, the gang's top echelon,
have been convicted of operating a continuing
criminal enterprise, 21 U.S.C. sec.848, and
sentenced to life imprisonment. Of the remaining

three appellants, William Edwards was sentenced to life imprisonment and Adrian Bradd to 292 months' imprisonment for conspiring to distribute drugs, while Darrell Branch was sentenced to 324 months' imprisonment for conspiracy plus money laundering.

Many of the arguments these eight defendants present on appeal have been dealt with by the panels that affirmed the convictions of other gang members. For example, Hoover and his henchmen direct their strongest fire against the prosecution's best evidence--tapes of intercepted conversations, evidence so crushing that the rest of the prosecution's case scarcely mattered. Defendants offer three principal arguments: that a district judge in the Northern District of Illinois lacked authority under 18 U.S.C. sec.2518(3) to authorize interceptions of conversations that occurred in the Southern District of Illinois, that the statutory authority for roving surveillance is unconstitutional, and that the recorded conversations must be suppressed because the original tapes were not sealed promptly after the authorization expired, as 18 U.S.C. sec.2518(8)(a) requires. All of these arguments were made in Jackson and rejected there with respect to these very tapes. 207 F.3d at 914-18. Although the Supreme Court remanded in Jackson so that we could consider the effect of Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348 (2000), the petition for certiorari was denied to the extent that it sought review of the wiretap issues. Relying on Jackson, we rejected in Wilson arguments materially identical to those now presented. 237 F.3d at 831. Our appellants have offered some additional arguments, such as a contention that the affidavits do not show the necessity of using interceptions, as opposed to other investigative techniques, but these are weak. None of the new arguments is persuasive, and the new versions of the old arguments run headlong into the law of the circuit. Now that the court has held that these tapes were properly admitted in two other trials, and rehearing en banc and certiorari have been denied on that subject, it would be inappropriate for a third panel to offer an independent view as if the matter were presented for the first time. Therefore, just as in Wilson, we reject on the basis of stare decisis appellants' contention that the use of these tapes requires reversal.

Similarly we conclude that the CCE convictions are valid whether or not Hoover and the other leaders personally committed the predicate offenses on which the CCE convictions depend. So we held in Wilson, 237 F.3d at 833-34, and Smith, 223 F.3d at 573. Cf. United States v. Pino-Perez,

870 F.2d 1230 (7th Cir. 1989) (en banc) (aiding and abetting a kingpin can support a CCE conviction). Predicate offenses include violations of 21 U.S.C. sec.841 (the principal substantive drug crimes). One way of violating sec.841 is to join a conspiracy whose members defy that statute. This is the holding of Pinkerton v. United States, 328 U.S. 640 (1946): every member of a conspiracy is substantively culpable for other conspirators' acts within the scope of the conspiracy. This means that Hoover and other top managers have violated sec.841 whether or not they sold drugs (or committed the conspiracy's other crimes) personally. Requiring personal commission of the predicate offenses would essentially knock out the sentencing enhancements that sec.848 provides for kingpins, who delegate the dirty work. They direct others in selling drugs or rubbing out rivals, and if this insulated them from culpability then sec.848 might as well be repealed. Using as predicate offenses crimes committed by a different branch of the organization also is appropriate. Wilson and Strawhorn want us to proceed as if the Gangster Disciples were multiple organizations, one for each territory controlled by a governor, but that is not what the jury found: they were convicted of a single conspiracy and under Pinkerton are answerable for the crimes committed by the whole of that organization.

Because a lawful punishment for every CCE conviction is life in prison, we held in Smith that Apprendi does not affect sentencing for this offense. The three defendants who were not convicted under sec.848 have a sound contention that the district court committed error by not telling the jury to determine the kind and quantity of drugs that they distributed. But these defendants did not request such an instruction in the district court, so appellate review is limited to a search for plain error. Only a miscarriage of justice could justify a remand. See Johnson v. United States, 520 U.S. 461 (1997); United States v. Olano, 507 U.S. 725 (1993); United States v. Nance, 236 F.3d 820 (7th Cir. 2000). What must be proved beyond a reasonable doubt after Apprendi is the minimum quantity needed to authorize a particular punishment. Given 21 U.S.C. sec.841(b)(1)(A)(iii), a conclusion that Edwards conspired to distribute 50 grams of crack cocaine would authorize life imprisonment; even 5 grams would do for Bradd and Branch, who were sentenced to fewer than 40 years. See 21 U.S.C. sec.841(b)(1)(B)(iii). Evidence in the record establishes beyond any doubt that the Gangster Disciples distributed (much) more than 50 grams of crack daily, so given Pinkerton (and the jury's verdict convicting each appellant of the

over-arching conspiracy) there is no likelihood that any reasonable jury would have failed to find that each is culpable for more than 50 grams of crack. Plain error has not been established. Defendant Wilson's variations (adopted by other defendants) on the Apprendi argument fare no better. Wilson contends that any fact raising a mandatory minimum penalty must be established beyond a reasonable doubt, even if the statutory maximum is life. Smith addressed and rejected that precise argument. As for the contention that sec.841 and sec.848 are unconstitutional (and therefore cannot support any conviction at all) because they do not designate as "elements" the quantities of drugs that matter to punishment: that position is considered, and rejected, in United States v. Brough, No. 00-2695 (7th Cir. Mar. 22, 2000).

Thus we arrive at issues unique to these defendants. The most serious is a Bruton problem (see Bruton v. United States, 391 U.S. 123 (1968)) created when the district judge permitted the prosecutor to use against Andrew Howard a statement that named Hoover and Shell as the gang's top bosses. Bruton holds that it violates the confrontation clause of the sixth amendment to admit against one defendant a confession accusing a co-defendant, when the declarant will not testify and thus cannot be cross-examined. Judges' instructions to consider the statement solely against its maker will be impossible to follow, the Court concluded. Bruton left open the possibility of redacting a confession to avoid the problem, and Richardson v. Marsh, 481 U.S. 200 (1987), held that some forms of redaction are permissible. Seizing this opening, the prosecutors amended Howard's confession so that "incarcerated leader" replaced every reference to Hoover, and "unincarcerated leader" every reference to Shell. (Hoover ran the Gangster Disciples from state prison, apparently bribing guards with cash and drugs to be allowed the freedom to do this; Shell, who was released from state prison in 1992, was Hoover's ambassador on the outside from then on.) Only a person unfit to be a juror could have failed to appreciate that the "incarcerated leader" and "unincarcerated leader" were Hoover and Shell; we doubt that the majority in Richardson would have countenanced so transparent a device. No matter, because in Gray v. Maryland, 523 U.S. 185 (1998), the Court placed close limits on the use of pseudonyms and indirect references. The Court wrote: "Redactions that simply replace a name with an obvious blank space or a word such as 'deleted' or a symbol or other similarly obvious indications of alteration . . . leave statements that, considered as a class, so closely resemble Bruton's unredacted statements that . . . the law must require the

same result." Id. at 192.

The district judge cannot be faulted for failing to anticipate Gray, which was issued after the trial; but we are surprised that even after Gray the United States contends that no error occurred. "Incarcerated leader" and "unincarcerated leader" are obvious stand-ins for "Hoover" and "Shell." A name is itself just one among many means of identification. The amended confession just gave Hoover and Shell aliases based on their occupations. It no more concealed their identities than the substitution of "Mark Twain" for "Samuel Clemens" conceals the author.

The prosecutor relies on United States v. Stockheimer, 157 F.3d 1082, 1086 (7th Cir. 1998), for the proposition that Bruton and Gray permit the use of placeholders when their incriminating nature is not apparent to persons unaware of the other evidence offered at trial. True enough, the panel in Stockheimer remarked that the altered confession, which referred to an "inner circle" of persons, would not have incriminated the non-confessing defendants without considerable other evidence. But the proposition that replacing a name with a pseudonym is proper unless the identity of the alias can be deduced within the four corners of the confession is incompatible with Gray, and we do not read the opinion in Stockheimer to adopt what was, after all, the main argument of the dissenting opinion in Gray. Very little evidence is incriminating when viewed in isolation; even most confessions depend for their punch on other evidence. To adopt a four-corners rule would be to undo Bruton in practical effect. An alteration that uses an open-ended reference such as "inner circle" at least avoids a one-to-one correspondence between the confession and easily identified figures sitting at the defense table. "Incarcerated leader" and "unincarcerated leader" are just the sort of symbols that the majority in Gray had in mind. If the prosecutors wanted to use Howard's confession yet avoid a severance, they had to make substantially greater alterations to avoid the obvious pointers.

Nonetheless, the Bruton error was harmless beyond a reasonable doubt. The tapes scuttled Hoover's defense. Shell received less mention in the tapes, but Howard's words could not have mattered to the jury's consideration of the case against Shell given seven weeks of other damning evidence. Indeed, the defense pretty much sewed up the prosecutor's case. Hoover and Shell admitted that they were the leaders of what everyone called the "GD" but contended that since 1987 "GD" has stood for "growth and development" rather than "Gangster Disciples." Shell portrayed

himself as the CEO of an organization of community activists committed to cleanup, education, political awareness, and suppression of gang and drug activities. Other evidence introduced at trial made mincemeat of that defense (the only gang and drug activities being suppressed were those of the GD's rivals), leaving Shell's admission that he was No. 2 in the GD equivalent to a confession. His conviction cannot plausibly be traced to the thinly disguised accusations in Howard's statement.

Two arguments about co-conspirator hearsay come next. All defendants contend that the district court should not have allowed any co-conspirator evidence to be admitted without first holding an evidentiary hearing to supply a basis for a conclusion that a conspiracy existed and the statements were in furtherance of that conspiracy. See Fed. R. Evid. 104, 801(d)(2)(E). A hearing is one way to go about the task, see United States v. James, 590 F.2d 575 (5th Cir. 1979) (en banc), but not the only or even the best way. A judge may act on the basis of a pretrial evidentiary proffer or evidence introduced in the early stages of trial. See United States v. Martinez de Ortiz, 907 F.2d 629 (7th Cir. 1990) (en banc); United States v. Santiago, 582 F.2d 1128 (7th Cir. 1978). The district judge's decision to admit co-conspirator hearsay in this case was supported by a preponderance of the evidence demonstrating that a conspiracy existed and that the statements had been made during and in furtherance of its objectives. That is so even for the statements to which Strawhorn particularly objects. Tyrone Reames testified that in August 1988 Strawhorn and another gang member threatened to "take care" of Reames unless he changed his account of a murder in which two gang members had been implicated. Strawhorn observes that Reames was not a member of the Gangster Disciples, and we shall assume that this is so. But the declarant in the statement being admitted was Strawhorn, not Reames (who was available for cross-examination). Much evidence showed that the Gangster Disciples protected their organization by threatening to "take care" of potential witnesses (and by using violence against them when threats were insufficient). The district judge did not abuse his discretion in concluding that Strawhorn threatened Reames in furtherance of the conspiracy's objective of protecting itself (and its members) from criminal prosecution. It could not be excluded under Fed. R. Evid. 404(b) as other-crime evidence, because it was part of the very crime (conspiracy) of which Strawhorn had been indicted. The statement therefore was admissible.

Shell and Strawhorn were not the only defendants whose words came to haunt them at trial. The defense rested without presenting any testimony by Bradd, and the prosecution began its rebuttal case. Bradd then changed his mind and asked for an opportunity to testify. The district judge had the discretion to say that he had waited too long, but the judge elected to grant Bradd's request. None of the other defendants objected. Soon they wished that they had, because Bradd's testimony inculpated not only himself (he admitted being a drug dealer but claimed that he had quit the GD and usually operated independently) but also Hoover and other defendants whom Bradd depicted as drug lords. Bradd supported the prosecutor's claim that Hoover initiated a program under which members of the Gangster Disciples would "donate" their profits from drug sales one day each week to supervisory levels of the gang. (This program, known variously as "nation work" and "one-day-a-week", had been a bone of contention at trial. Other defendants contended that references on the tapes dealt only with working for community betterment one day a week. Bradd supported the prosecution's view.) Other defendants then moved for a mistrial or a severance. The district judge denied both requests and did not abuse his discretion in doing so. If Bradd had testified during the defense's case there would have been no occasion for either a mistrial or a severance. See Zafiro v. United States, 506 U.S. 534, 538-39 (1993). Finger-pointing among the defendants is not only acceptable but also a benefit of a joint trial, for it helps the jury to assess the role of each defendant. Defendants believe that things are otherwise if the evidence comes after the close of the defense case, but we cannot see why--nor do we understand what difference it makes whether the district judge recognized that he had discretion to block Bradd's testimony or thought instead (though wrongly) that a defendant's entitlement to testify on his own behalf supersedes the rules for the orderly presentation of evidence. The harm to the other defendants would have been much the same had Bradd testified before the defense rested. They contend that if Bradd had testified sooner they could have countered his evidence more effectively, but this is not so; the district judge gave them adequate opportunity to respond to Bradd's testimony as things transpired.

One final issue arising out of the trial requires comment. (Defendants make many additional claims of trial error, but none requires discussion.) Wilson testified in his own defense that he joined the GDs in 1987 when it was solely a civic improvement organization and that neither he nor anyone he associated with was

involved in drug trafficking. In rebuttal, the government called Naseen Soldana, Wilson's former wife, who testified that in late 1992 or early 1993 Wilson asked her for an introduction to Reynard McDowell, from whom Wilson sought to buy 15 kilograms of cocaine. Soldana made the introduction, McDowell quoted a price of $270,000, Wilson came up with that sum, and Soldana acted as his agent to finish the deal (paying McDowell and returning the drugs to Wilson). Soldana testified that Wilson and McDowell later had at least two other transactions of 26 kilograms apiece. Following her separation from Wilson, Soldana became romantically involved with McDowell, who later was prosecuted on drug charges. She testified under a grant of immunity as part of a plan to reduce McDowell's sentence. On learning that Soldana would take the stand in the prosecutor's rebuttal case, defendants asked the judge to issue a writ of habeas corpus to produce McDowell in Chicago for an interview, so that they could determine whether he might undermine Soldana's testimony. The court declined to do so unless defendants first ascertained from McDowell's attorney whether McDowell would consent to be interviewed (and to testify), for if McDowell would balk and assert his privilege against self-incrimination, the exercise would be pointless. On learning from McDowell's lawyer that McDowell would not cooperate with the defendants, the district judge declined to issue the writ.

Wilson contends that this episode violated his right under the sixth amendment to "have compulsory process for obtaining witnesses in his favor", but his problem is that McDowell did not seem likely to be a witness "in his favor", or indeed a witness of any kind. Soldana's testimony depicted McDowell as the supplier of 67 kilograms of cocaine. He has not been convicted of those sales, and the defense wanted to paint him not only as a drug dealer but also as a person who had suborned perjury; risks of prosecution for these offenses entitled McDowell to invoke his privilege against compulsory self-incrimination. If the district judge had gone off half-cocked, predicting that McDowell would invoke the privilege without troubling to check, then we would be receptive to an argument that he abused his discretion (which is the right standard of review). See United States v. Williamson, 202 F.3d 974, 978-79 (7th Cir. 2000). But the judge deferred decision until inquiry could be made, and only after learning that McDowell would clam up did the judge deny the defense request. We agree with the judge's assessment. It would have been wasteful--and could have caused a substantial and unproductive delay of a week or more--to fetch McDowell by Con Air from Florida

only to have him repeat in court what he had told his lawyer. Even now the defendants have no indication that McDowell's lawyer misunderstood or misrepresented his client's intentions.

Sentencing is the final subject of discussion. The United States has confessed error with respect to Branch's sentence, and after an independent review we agree that an error has been made. The district judge assessed one criminal history point for Branch's 1980 conviction for resisting arrest. That put Branch in criminal history category IV (he had six other, undisputed, criminal-history points) and led to a sentencing range of 324 to 405 months under the Sentencing Guidelines. The judge imposed a sentence of 324 months, the bottom of this range, which suggests that Branch might have received an even lower sentence had his background been assessed as category III, for which the sentencing range would have been 292 to 365 months. Like the United States, we think that category III is the correct one, because U.S.S.G. sec.4A1.2(c) disregards Branch's conviction for resisting arrest. A conviction for resisting arrest leads to a criminal history point only if the defendant received at least 30 days' imprisonment or one year's probation. Branch's sentence to two days (time served before his guilty plea) was well short of that. He therefore must be resentenced within the range of 292 to 365 months. Branch's original sentence of 324 months is below the middle of the reduced guideline range, so the district judge may elect to impose the same sentence on remand, but if he does this the judge should explain why the change in criminal history did not affect the sentence.

None of the other arguments concerning sentencing calls for a reduction. The life sentences for the CCE defendants are foreordained. And although we may assume, as the other three defendants insist, that the one-day-a-week program did not get off the ground and that the nation-work program (which did) entailed smaller quantities, the sums the leaders hoped to rake in were so large that they conveyed to other defendants, such as Bradd, the scale of the organization, which enabled them to anticipate (and so be held accountable for) sales other than those in which they personally participated.

The judgments are affirmed with respect to all defendants other than Branch. His conviction is affirmed but his sentence is vacated, and the case is remanded with instructions to impose a new sentence from the range of 292 to 365 months' imprisonment.

Cudahy, Circuit Judge, concurring. Although it probably did not affect the outcome, the admission of Reames' testimony about Strawhorn's threats raises serious questions. Tyrone Reames was permitted to testify that in August 1988, he witnessed a murder committed by two Gangster Disciples from his neighborhood. Two years later, as the Gangster Disciples' state court murder trial date approached, Reames said he was approached by Strawhorn and another Disciple, who grabbed him and took him to see "Coal Black," who was identified as Robert Dordies, another Disciple. Strawhorn and Dordies, according to Reames, threatened that if Reames did not change his account of the murder to exculpate the Disciples charged with it, Strawhorn would "take care of" him. Reames himself was not a member of the Gangster Disciples or any other street gang, and the alleged murder had nothing to do with the drug conspiracy charged in this case.

The government offered the Reames testimony to show, among other things, an example of enforcement of the law of silence and secrecy in the gang. The district court instead found that "in order to make the conspiracy go, they offered protection to certain people and one of the ways they did that was to intimidate people from testifying. So, it seems to me one of the main procedures that gangs have always--not gangs so much as organized crime activities--have always been conducted."

There may be some marginal relevance to Reames' testimony as showing gang practices in enforcing silence about gang crimes. As the district judge said, this was the way of organized crime. But the facts surrounding Reames' testimony had nothing to do with the drug conspiracy with which the Disciples were charged.

It was uncontested at trial that Strawhorn was a longstanding member of the Disciples with the rank of governor and that he knowingly assented to gang rules. The probative value of showing his threats to silence witnesses in matters having nothing to do with the distribution of drugs is slight while the prejudice attaching to hushing up a witness could hardly be greater. Indeed, we have noted that evidence of witness intimidation constitutes "a striking example of evidence that appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish or otherwise may cause a jury to base its decision on something other than the established propositions in the case." United States v. Thomas, 86 F.3d 647, 654 (7th Cir. 1996). The introduction of this testimony, therefore, exposed heinous conduct typical of organized

crime but which had no plausible connection with the drug conspiracy. Although the outcome may not be affected, Reames' testimony should not have been admitted.

ROVNER, Circuit Judge, concurring. I join the court's opinion. I write separately only to express my concern about the findings of a previous panel of this court regarding the government's failure to have the Vienna surveillance tapes sealed immediately upon expiration of the surveillance warrant, as 18 U.S.C. sec. 2518(8)(a) required. See United States v. Jackson, 207 F.3d 910, 915-18 (7th Cir.), remanded on other grounds, 121 S. Ct. 376 (2000). Jackson concluded that none of the documented reasons that the government gave to the district court for waiting 32 days to have the tapes sealed constituted the "satisfactory explanation" for the delay that section 2518(8)(a) demands. 207 F.3d at 915-18. Rather than ordering the tapes suppressed, however, the court embraced an explanation founded on facts that were not asserted in the affidavit submitted by the prosecutor in charge of the surveillance. Id. at 918. If indeed the "real reason" for the delay was the government's expectation, based on the assurance of technicians, that a new and smaller microphone would become available within a day or two, an assurance that purportedly was repeated until finally "it became clear that 'a few days' were going to stretch on indefinitely," id., then I cannot fathom why that reason was not spelled out in the affidavit, which was the only evidence before the district court, and remains the only evidence before this court, as to the explanation for the delay in sealing the tapes. See id. at 916. Even more perplexing to me is this court's decision to accept as a satisfactory explanation for the delay an asserted reason which, although it may be true and accurate, has no support in the record.

We routinely disregard arguments premised upon factual assertions that are not borne out by the record. E.g., United States v. Phillips, 914 F.2d 835, 840 (7th Cir. 1990) ("An appellant may not attempt to build a new record on appeal to support his position with evidence that was never admitted in the court below."); Box v. A&P Tea Co., 772 F.2d 1372, 1379 n.5 (7th Cir. 1985) ("arguments in briefs are not evidence"), cert. denied, 478 U.S. 1010, 106 S.Ct. 3311 (1986); see also Adickes v. S.H. Kress & Co., 398 U.S. 144, 157-58 n.16, 90 S. Ct. 1598, 1608 n.16 (1970); Russell v. Southard, 53 U.S. (12 How.) 139, 159 (1851). We do not allow parties to stray beyond

the bounds of the record for reasons so obvious and familiar that they scarcely require mention: if the evidence upon which a party bases its argument is not in the record, then the opposing party has not had the opportunity to respond appropriately, the district court has never had the opportunity to assess that evidence, and last, but by no means least, when push comes to shove, the "evidence" may never materialize--litigants often make representations that turn out to be inaccurate. I have no reason to think that the government has misrepresented the facts, but if indeed the "real reason" for the delay in sealing the tapes was the prosecutor's expectation that a more discreet microphone would shortly become available, then some evidence of that expectation should have been produced long before the record closed and the Jackson case was on appeal. Instead, the unverified and untested factual assertions of a brief have become the foundation for the law of this circuit, binding panel after panel hearing the Gangster Disciple appeals and defendant after defendant--none of whom has ever seen any evidence bearing out the government's asserted rationale for the delay in sealing the tapes./1

Our credibility as a judiciary depends in great measure upon the consistency and fairness with which we honor our own rules. At oral argument, Mr. Edwards' counsel observed that if he were to make assertions outside of the record, we would not tolerate it for a moment. He is right. The government should be treated no differently. Obviously, suppression of the tapes--described in Jackson as "[s]ome of the government's strongest evidence," 207 F.3d at 913, and here as its "best evidence . . . , evidence so crushing that the rest of the prosecution's case scarcely mattered," ante at 2, might have dire ramifications for the government's case. Yet, the stakes were no doubt apparent to the government when the affidavit was prepared. I do not understand why the government should be relieved of the obligation to make a record in support of its arguments--particularly its "real reason" for a crucial delay in complying with a statutory requirement--when we would not relieve any other litigant of that obligation. Simply because the ramifications are odious does not justify a departure from the basic tenets of fairness, common sense, and the rule of law.

It is with the greatest reluctance that I criticize the holding of another panel of my colleagues. But the same issue that confronted the panel in Jackson is squarely presented here, and the briefing in this case makes it abundantly clear that the key facts on which Jackson relied have no support in the record--Jackson itself

leaves little doubt in that regard. After much reflection, and with a heavy heart, I have concluded that I cannot remain silent with respect to this court's unusual decision to accept the government's unverified allegations as "a (barely) satisfactory explanation" for the government's delay in complying with its statutory obligations. See 207 F.3d at 918.

I accept, as I must, the panel's holding in Jackson; it is the law of this circuit vis a vis the admissibility of the Vienna tapes. See United States v. Wilson, 237 F.3d 827, 831 (7th Cir. 2001); ante at 2-3. I do so, however, with great reservation as to the prudence of this court's decision to accept as fact crucial assertions made only in a brief, and with the hope that in the future, the government will make an appropriate record as to its "real reason" for any failure to comply with the requirements of Title III.

/1 Jackson notes that the district judge himself relied on the government's explanation as a reason for admitting the belatedly sealed tapes into evidence. 207 F.3d at 918; see United States v. Parks, No. 95 CR 510, 1997 WL 136761, at *20 (N.D. Ill. March 24, 1997). To the extent that is true, it hardly justifies this court's resort to asserted facts that are without support in the record; our review of the sufficiency of the government's explanation must focus on the evidence submitted to the district court. See United States v. Ojeda Rios, 495 U.S. 257, 267, 110 S. Ct. 1845, 1851 (1990) (majority); id. at 267-68, 110 S. Ct. at 1852 (O'Connor, J., concurring).