In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 10-2879, 11-1617 & 11-1625

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

LESLIE LOVE AND BOBBIE BROWN, JR.,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 08 CR 453 and 08 CR 452—**Wayne R. Andersen** and
**Virginia M. Kendall**, *Judges.*

ARGUED JANUARY 18, 2012—DECIDED MAY 24, 2012

Before BAUER, MANION, and WOOD, *Circuit Judges.*

MANION, *Circuit Judge.* This case involves the criminal appeals of two defendants: Bobbie Brown, Jr., the mastermind of a large mortgage fraud scheme, and one of his accomplices, Leslie Love. Brown's scheme occurred in two different real estate markets, Las Vegas and Chicago, and involved recruiting many lawyers, accountants, loan officers, bank employees, realtors,

home builders, and home buyers to further a plan where residential properties were purchased at inflated sales prices by insincere buyers with fraudulent loan applications. The money accumulated by Brown through his scheme generally consisted of the difference between the inflated sales price and the actual value of the property. Later, when the properties were resold at lower prices or went into default, the financial institutions that made the mortgage loans suffered combined losses of at least $32 million.

Brown, Love, and 31 other accomplices were apprehended and charged with a host of fraud counts. Brown and Love both pleaded guilty to fraud; Brown was sentenced to 260 months' imprisonment, and Love to 66 months' imprisonment. Their cases have now been consolidated on appeal, and Brown and Love challenge different aspects of their respective sentences. Love contests the number of victims used to calculate his sentencing guidelines; his position has merit, and so we vacate his sentence and remand for resentencing. Brown contests the loss calculation used for his guidelines range and argues that his sentence is unreasonable; his argument is unpersuasive, and we thus affirm his sentence.

## I. Background

Between August 2004 and May 2008, Brown ran an elaborate scheme to defraud mortgage lenders by duping those lenders into issuing approximately 150 fraudulent mortgage loans. Brown used several

businesses that he owned in order to conduct his scheme, and he operated in two real estate markets, Chicago and Las Vegas. Brown was the mastermind behind the plan, and he recruited or directed dozens of individuals to further the scheme: lawyers, accountants, loan officers, bank employees, realtors, home builders, and nominee buyers. Of his accomplices, 32 people were apprehended and criminally charged.

To operate his scheme, Brown first recruited individuals to be the nominee buyers of new or newly renovated residential properties. Brown told the nominees that they would not have to put any money down for the purchase, that they would not have to make any mortgage payments, and that their names would be removed from the mortgage and title within 12 months—the properties would either be sold within that period, or Brown himself would personally purchase the properties from the nominees. Brown paid each nominee approximately $15,000 to $50,000 for every property the nominee purchased.

Brown also colluded with the home builders and the sellers of these residential properties, prompting them to sell their properties to Brown's nominees at inflated prices. In particular, Brown convinced the builders and sellers to appraise their properties at a value at least 10% higher than the actual value of the property.

Brown then recruited loan officers to prepare and submit fraudulent loan packages to the lending financial institutions. The loan applications contained false state-

ments and omissions; they inflated the nominees' income and assets; they understated the nominees' liabilities; and they failed to disclose the nominees' intentions about not residing at the property, their relationships with Brown, and the fact that the nominees had purchased other residences and had obtained other mortgages. The loan officers who prepared the fraudulent loan applications received kickbacks from Brown for their services, and as with the nominees, the relationships between these loan officers and Brown were not disclosed to the lenders.

In addition to all of this, Brown recruited bank employees to create false verifications of deposit in order to support the false claims made in the nominees' loan applications regarding their financial statuses. He recruited employees from his companies to create false verifications of employment and false verifications of rent and leases for the nominees. He recruited accountants to create false letters alleging that the accountants had prepared tax returns for the nominees. Finally, he recruited attorneys privy to the scheme to represent the nominees at real estate closings and to ensure that the closings went smoothly.

Through the Chicago scheme, Brown obtained approximately 150 fraudulent mortgage loans, totaling more than $95 million in loan proceeds from the victim lenders. The Las Vegas scheme resulted in approximately 33 fraudulent loans totaling about $16 million.

In June 2008, in two separate indictments—one for the Las Vegas scheme and one for the Chicago

scheme—Brown was charged with multiple counts of wire fraud, bank fraud, mail fraud, and identity theft. In January 2010, he entered a plea of guilty in the Las Vegas case without a written plea agreement with the government; in April 2010, he entered a guilty plea in the Chicago case through a plea agreement. The two cases were consolidated for sentencing purposes. In March 2011, the district court conducted a sentencing hearing: Brown was sentenced to 216 months' imprisonment for the Las Vegas scheme and 240 months' imprisonment for the Chicago scheme, to run concurrently. The district court also imposed a restitution amount of more than $32.2 million. Brown's appeal is now before us; he does not contest his conviction, but he does challenge his sentence.

The other appeal before us is that of one of Brown's co-defendants, Leslie Love. Love was involved in Brown's Chicago scheme from spring 2005 to fall 2006, and participated in several fraudulent loan transactions. Love was charged with multiple counts of fraud. Following a plea agreement, he pleaded guilty to one count of mail fraud. Love was sentenced to 66 months' imprisonment and ordered to pay more than $7.1 million in restitution. Love now appeals his sentence.

## II. Love's Appeal

We begin with Love's case. In order to calculate his sentencing guidelines, Love was found to be associated with the fraudulent transactions for 18 different real estate properties, and thus he was held responsible for

a total loss of more than $7.1 million. The sentencing judge also found that the loss affected more than ten victims—namely, the financial institutions swindled by the fraudulent loan transactions. As a consequence, the court imposed the two-level sentencing enhancement under U.S.S.G. § 2B1.1(b)(2)(A)(i), for offenses with more than ten victims. Love's final total offense level was 33, which corresponded to an applicable sentencing guidelines range of 135 to 168 months. After discussing the 18 U.S.C. § 3553(a) sentencing factors, the district court ruled that there were mitigating factors in Love's case and that the suggested guidelines range was not fair. Consequently, the court imposed a sentence of 66 months.

Love appeals his sentence on the ground that the district court erroneously applied the two-level enhancement for an offense with more than ten victims—Love argues that there were only seven victims associated with his offense. Love contends that this error was not harmless, even though he received a below-guidelines sentence, because there is no indication that the district court would have imposed the sentence had it calculated the guidelines correctly without the two-level enhancement. Therefore, Love argues, the error should be corrected and his case should be remanded for resentencing. Love also notes that the judgment makes his restitution of approximately $7.1 million payable to "Peoples Choice Home Loan," but that this is incorrect—instead, the judgment should be corrected, with the appropriate portion of the restitution designated to each of the seven victim lenders.

"We review the procedures followed by the district court in sentencing de novo." *United States v. Glosser*, 623 F.3d 413, 418 (7th Cir. 2010). In this case, the government agrees with Love's argument on appeal and concedes that there was an error in calculating the number of victims—there were only seven victims associated with Love's offense, not more than ten. Thus, Love's final total offense level should have been 31, not 33, for a sentencing guidelines range of 108 to 135 months, instead of 135 to 168 months. Even though Love received a sentence that was significantly below the guidelines range, the range on which his sentence was based was erroneously calculated. Such an error is not harmless because it is impossible to know whether the district court would have imposed the same sentence had it not committed this procedural error. *See Glosser*, 623 F.3d at 419-20. We therefore vacate Love's sentence and remand for resentencing using the correct guidelines range. Additionally, the judgment should be corrected with the appropriate amount of restitution properly designated to the seven victim lending institutions.

### III.  Brown's Appeal

We now turn to Brown's appeal. Brown objects to two aspects of his sentencing: (1) he challenges the district court's loss calculation and his resulting sentencing guidelines range; and (2) he argues that his 240-month sentence was substantively unreasonable. We consider each issue in turn.

*A. Loss Calculation*

Brown first contests the district court's calculation of the loss attributable to his offense and the corresponding 22-level increase in his guidelines range. At the sentencing hearing, the government called FBI Special Agent Donald Kaiser as a witness. Kaiser had prepared two charts summarizing the fraudulent loan transactions that could be attributed to Brown's scheme: one chart identified 102 fraudulent transactions associated with the Chicago scheme, while the other identified 32 transactions in the Las Vegas scheme. To prepare the charts, Kaiser used information from loan files, title company records, real estate files, law enforcement databases, and other public sources. Kaiser made a loss estimate for each transaction by taking the original loan amount for each transaction and subtracting the resale amount for each property (when, for example, the property was sold after it went into foreclosure or when the original buyer conducted a short sale). In other words, Kaiser estimated the loss to the lender to be equal to the original loan given by the lender minus the amount recovered by the lender after the property's sale. During the sentencing hearing, Kaiser described the procedure he used for calculating the estimated loss using two particular transactions as examples.

After Kaiser's testimony, the district court admitted the two loss-summary charts as evidence, considering the fact that the voluminous documents summarized in the charts could not be conveniently examined by the

court. The court also noted that several months earlier, the government counsel had met with the defense counsel to review the procedure underlying the summary charts. The district court then accepted the two charts as describing reasonable estimates of the losses incurred by the lending institutions as a result of Brown's criminal conduct. From the charts, the court concluded that a conservative estimate for the lenders' losses was approximately $32 million. Under the U.S. Sentencing Guidelines, a loss in excess of $20 million and less than $50 million corresponds to a 22-level increase in the offense level. *See* U.S.S.G. § 2B1.1(b)(L). The district court applied this 22-level enhancement, resulting in a total offense level of 36 and a corresponding sentencing guidelines range of 235 to 293 months.

On appeal, Brown argues that the district court erred when it admitted into evidence the two loss-summary charts and used the charts to calculate the estimated loss attributable to Brown's criminal conduct. We review a district court's calculation of loss for clear error. *United States v. Green*, 648 F.3d 569, 583 (7th Cir. 2011). "Because loss calculations are reviewed for clear error, we will only reverse if we are left with a definite and firm conviction that a mistake has been made." *United States v. Radziszewski*, 474 F.3d 480, 486 (7th Cir. 2007) (internal quotation and citation omitted). When calculating the loss for purposes of sentencing, the district court is only required to make "a reasonable estimate of the loss." *Green*, 648 F.3d at 583. That means that to successfully challenge the loss calculation, Brown "must show that the court's loss calculations 'were not only

inaccurate but outside the realm of permissible computations.' " *Id.* (quoting *Radziszewski*, 474 F.3d at 486).

Brown's challenge to the loss calculation lacks merit. Brown presents no evidence that the information contained and summarized in the charts is unreliable or erroneous. Brown's counsel had sufficient time and opportunity to fully review all of the information used to prepare the summary charts and has not identified any inaccuracies or errors. Furthermore, during sentencing, evidentiary standards are relaxed; a sentencing court can consider relevant information without regard to its admissibility under the rules of evidence as long as the information "has sufficient indicia of reliability to support its probable accuracy." *United States v. Oros*, 578 F.3d 703, 711 (7th Cir. 2009) (quoting U.S.S.G. § 6A1.3); *United States v. Rollins*, 544 F.3d 820, 838 (7th Cir. 2008). With Kaiser's testimony, this indicia of reliability is satisfied.

Brown characterizes the methodology used to calculate the loss as simplistic and erroneous. But the loss calculation method used by the district court—subtracting the sales price for each property from the loan amount—is a reasonable method for calculating loss that this Court has accepted on previous occasions. *See Green*, 648 F.3d at 584; *United States v. Serfling*, 504 F.3d 672, 679-680 (7th Cir. 2007); *Radziszewski*, 474 F.3d at 486-87. Brown presents no sufficient reason for us to conclude that this loss calculation is unreasonable, inaccurate, or "outside the realm of permissible computations." *Green*, 648 F.3d at 583.

Moreover, in its Presentence Investigation Report (PSR), the Probation Office similarly concluded that the total amount of loss was greater than $20 million but less than $50 million and recommended the 22-level increase as required by the Sentencing Guidelines. "The defendant bears the burden of proving that the PSR is inaccurate or unreliable." *Rollins*, 544 F.3d at 838. And if the defendant "offers no evidence to question the PSR's accuracy, the court may rely on the PSR." *Id.* In this case, Brown did not submit his version of the offense to the Probation Office and did not submit evidence that questioned the PSR's accuracy.

In short, Brown has the burden of producing evidence tending to show that the loss estimates are inaccurate or unreliable, but he has not done so here. *See Green*, 648 F.3d at 583. His mere assertions of inaccuracy are insufficient, and we are not left with "a definite and firm conviction that a mistake has been made." *Radziszewski*, 474 F.3d at 486. Because the district court's ruling on the amount of loss was based on reliable evidence and an acceptable calculation method, the district court made a reasonable estimate of loss. There is no clear error.

## B. *Reasonableness of the Sentence*

Brown also challenges his sentence on the basis that the district court was biased against him. "We review the reasonableness of a sentence under an abuse-of-discretion standard." *United States v. Poetz*, 582 F.3d 835, 837 (7th Cir. 2009).

Here, Brown's guidelines range was 235 to 295 months' imprisonment, with an additional consecutive 24 months on Count 26 for identity theft, which is mandated by statute. The district court ended up imposing a sentence of 216 months, below the low end of Brown's guidelines range, plus the mandated consecutive 24 months on Count 26, giving a total of 240 months' imprisonment. A sentence below the low end of the guidelines is presumed reasonable. *Id.* Yet despite this sentence, Brown argues that his sentence was substantively unreasonable. Brown's argument is based on the proposition that the district court allegedly had an emotional attitude and demonstrated personal bias against Brown by unreasonably blaming him for hurting and bringing down his co-defendants in the scheme. Brown concludes that this biased attitude unfairly affected his sentence. In support, Brown points to certain excerpts from the sentencing hearing where the district court called Brown a "Rasputin" or a "pied piper" who manipulated and corrupted good people, causing them to go to prison. Brown argues that his co-defendants were not innocent victims whom he corrupted, and that it was improper for the court to blame him and hold him responsible for their fates.

Brown's argument fails because the district court did not demonstrate unfair bias. The court adequately explained the 18 U.S.C. § 3553(a) factors and its reasoning for Brown's sentence, and then actually imposed a sentence that was under this recommend guidelines range by approximately 10%. When explaining its reasons for Brown's sentence, the district court discussed the serious nature of Brown's criminal conduct and the fact

that his scheme had a devastating impact on several communities because of its effect on the local property owners. The district court also noted the overwhelming scope of Brown's scheme, resulting in millions of dollars in losses affecting more than 20 individual communities, and his role in recruiting or directing 32 other co-defendants. The court also discussed Brown's character as an admitted gang member who was motivated by greed and who, even at sentencing, failed to fully appreciate the gravity of his actions and his primacy in the scheme. It was not improper for the court to take note of the significant influence and role Brown had exercised in relation to his co-defendants. Because the court sufficiently discussed the § 3553(a) factors and explained its reasoning for Brown's sentence, we find no abuse of discretion.

## IV. Conclusion

As described above, the district court erred in calculating Love's sentencing guidelines range, and this error is not harmless. Love's sentence is thus vacated and his case is remanded for resentencing with the corrected guidelines range. Additionally, his judgment should be corrected with the restitution correctly applied to each of the seven victims. As for Brown, the district court did not err in its loss calculation, nor did it abuse its discretion in imposing its sentence. Accordingly, the judgment of the district court in Brown's case is affirmed.