In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-2358

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

GUY STEIN,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 10 CR 1104 — **Rebecca R. Pallmeyer**, *Judge.*

ARGUED MAY 22, 2014 — DECIDED JUNE 26, 2014

Before POSNER, FLAUM, and MANION, *Circuit Judges.*

MANION, *Circuit Judge.* Guy Stein pleaded guilty to one
count of wire fraud stemming from a check-kiting scheme that,
along with related conduct, caused a total loss of approxi-
mately $1 million to multiple financial institutions. In this
appeal, Stein argues that approximately $440,000 of that loss
should not have been counted against him because one of the
principals of two of the financial institutions was complicit in

his scheme. Finding no error with the district court's resolution of this issue, we affirm.

## I. Background

Guy Stein ran legitimate companies—Big City Tickets and Advanced Design Consulting—for which he maintained bank accounts at three different banks. In need of "working capital financing assistance for [his] construction projects," he approached his friend Kevin Wiley. Wiley was a one-third owner of two currency exchanges, and he proposed that Stein write checks from his (underfunded) bank accounts to cash at the exchanges. That way, Stein would have use of the money to run his business for anywhere between a few to several days. At the end of that period, if his business had turned the profit he needed, the checks would clear without any problem. If not, he could write more checks, cash them, deposit enough proceeds to ensure the earlier checks cleared, and have more money to keep running his businesses in the hope of eventually turning a profit.[1] Stein did the latter for about five months, beginning in May 2010. Stein also used a third exchange, not related to Wiley, for this purpose. There was, however, a hitch in this plan. To clear previous checks *and* obtain the working capital needed for the next period, he would have to write larger (or more) checks each cycle. Further, each time a check was cashed, the exchange charged a fee of approximately 2%. Accordingly, the balance was spiraling upward while the annualized percentage rate for "borrowing" this working

---

[1] We use the term "cash" loosely to include both actually cashing the checks and purchasing money orders with the checks.

capital was anywhere from 100% to over 200% "interest" (depending on whether the period between cashing and clearing checks, over which the roughly 2% fee was spread, was several days or only a few days).[2] All the time, this juggling act (a check-kiting scheme) provided only a small amount of working capital. Needless to say, this was a totally irrational method of financing his construction projects. We do not need to know why Stein did not get a traditional loan or even look ahead to where this scheme would lead. Regardless, things came to a head when Stein was injured in a car accident and was not physically able to orchestrate the next round of checks. At that juncture, the Wiley exchanges suffered a loss of about $440,000 from checks that the banks did not clear because Stein's bank accounts had insufficient funds. The third exchange, Grand Avenue Currency Exchange, likewise lost about $250,000. Together with some related conduct not at issue in this appeal, the total loss to financial institutions as a result of Stein's conduct was over a million dollars.

When his fraud came to light, Stein pleaded guilty to one count of wire fraud, in violation of 18 U.S.C. § 1343. At his initial sentencing, the district court calculated his guideline range as 33–41 months based on his crime of conviction and a loss amount of about $1,170,000 (which took into account some money he had paid back). However, the district court noted that Stein's scheme was not designed to enrich himself. Rather, his fraud was orchestrated to keep his businesses afloat and pay his employees. For these and other relatively sympathetic factors, the district court sentenced him below the guidelines

---

[2]   The shorter the period, the higher the effective annual "interest."

to 24 months' imprisonment. Stein appealed, arguing that the district court erred in its loss calculation. While on appeal, we granted a limited remand so the district court could consider Stein's motion for reconsideration of sentence. The district court granted that motion and revised the loss amount, for purposes of calculating the guidelines, down to about $960,000. This resulted in a guideline range of 27–31 months. *See* U.S.S.G. § 2B1.1(b)(1)(H), (b)(1)(I) (offense level increases by two above a one million dollar threshold). Sticking with its earlier reasoning, the district court again gave a below-guidelines sentence of 21 months' imprisonment. However, the court still entered a restitution amount of slightly over one million dollars in the amended judgment.

In this appeal, Stein argues that the roughly $440,000 loss he caused to Wiley's exchanges should not be incorporated into the restitution judgment because of Wiley's complicity in his scheme.[3] The government disagrees, but adds that the amended judgment should be revised because the approximately one million dollar figure for restitution is a scrivener's error and the correct figure is about $960,000.

## II. Discussion

"We review the district court's factual findings for clear error, reversing only when we are 'left with the definite and firm conviction that a mistake has been made.'" *United States*

---

[3] Stein does not argue that his guideline range was erroneously calculated because, even if $440,000 was subtracted from the loss amount, he would remain in the same loss range under the guidelines. *See* U.S.S.G. § 2B1.1(b)(1)(H), (b)(1)(I) (offense level is constant when the loss is above $400,000 and below $1,000,000).

*v. White*, 737 F.3d 1121, 1142 (7th Cir. 2013) (quoting *United States v. Cruz–Rea*, 626 F.3d 929, 938 (7th Cir. 2010)). However, "[w]e review the calculation of restitution for abuse of discretion." *United States v. Frith*, 461 F.3d 914, 919 (7th Cir. 2006). "[T]he district court need only make 'a reasonable estimate of the loss' in applying the enhancement. … Thus, on appeal, a defendant must 'show that the court's loss calculations were not only inaccurate but outside the realm of permissible computations.'" *White*, 737 F.3d at 1142 (quoting U.S.S.G. § 2B1.1, application note 3(C), and *United States v. Love*, 680 F.3d 994, 999 (7th Cir. 2012)). We will only upset an order of restitution "if the district court used inappropriate factors or did not exercise discretion at all." *Frith*, 461 F.3d at 919.

Stein does not dispute that approximately $440,000 worth of checks he cashed at Wiley's exchanges were not honored because of insufficient funds, and this was the evidence the government offered for the district court to calculate the loss. Rather, Stein argues that ordering restitution for this amount was unreasonable because Wiley was complicit in the fraud, and in fact, "earn[ed] significant profits" from the transaction fees.[4] Appellant's Reply Br. at 1. The record strongly indicates that Wiley's exchanges did not profit in the end.[5] But even if

---

[4]  Initially, Stein argued that Wiley's testimony was not reliable enough to be used to establish the loss amount, but after the government responded that Wiley's testimony was not needed to arrive at the loss amount, Stein narrowed his argument to Wiley's complicity in his reply.

[5]  During the course of Stein's check-kiting scheme, he cashed about 1,500 checks for a total value of about $13,000,000. Pre-sentence Investigation

(continued...)

the exchanges had profited from the transactions, that alone does not require reducing the restitution due them. The exchanges received the fees for services that they rendered, and so were entitled to those fees in addition to the money from the checks which they had cashed for Stein. Accordingly, if there is any merit to Stein's argument, it must rest in his assertion that Wiley was complicit in the fraud, such that the exchanges he part-owned are not really victims. This, however, was reasonably dealt with by the district court:

> My conclusion with respect to Wiley is this: The victims are the currency exchanges. Wiley himself may have played an improper role. And to the extent that he was recovering, he or the currency exchanges hoped to recover some fee or percentage. He hasn't been victimized to that extent.

> But the victim, that is, the currency exchange, a business that has a separate existence from Mr. Wiley, was victimized by the amount of the dishonored checks. So that calculation I am satisfied with. I don't think I need to make any adjustments to that.

---

(...continued)

Report ("PSR") at 5, ¶ 14. Not all of these checks were cashed at Wiley's exchanges and the parties disagree about the transaction fee. But even assuming all $13,000,000 of checks were cashed at Wiley's exchanges and the fee was the 2.25% Stein asserts, that is only an income of about $300,000 for Wiley's exchanges—still not a "profit" set against the $440,000 loss. The loss amount is less than the total value of kited checks because earlier-cashed checks cleared from the proceeds of later-cashed checks; only the last cycle failed and exposed the accumulated loss.

October 31, 2013, Sentencing Tr. ("Sent. Tr.") at 6–7. The currency exchanges had their own separate existences. It is irrelevant that Wiley was a contributing cause. He is not the victim, the exchanges are. Stein was clearly a but-for and proximate cause of the losses which the exchanges suffered. *See, e.g.*, *United States v. Robertson*, 493 F.3d 1322, 1334 (11th Cir. 2007) ("'Defendant's conduct need not be the sole cause of party's loss'") (quoting *United States v. Gamma Tech Indus., Inc.*, 265 F.3d 917, 928 (9th Cir. 2001)).[6]

Further, Wiley's misconduct while a partial owner does not change the exchange's victim status or the propriety of the calculation. Wiley's encouraging Stein to undertake the risky check-kiting scheme may have created multiple transactions which initially benefitted the exchanges (the victims), and himself by virtue of his relation to the exchanges. But, again, the exchanges provided services to Stein to earn their fees and the exchanges suffered $440,000 in losses when Stein's checks were not honored by his banks. Stein may have a civil claim against Wiley for contribution arising from Wiley's facilitating conduct, but that does not relieve Stein of his obligation to compensate his victims. 18 U.S.C. §§ 3663A (making full restitution mandatory), 3664(h) (allowing the district court to apportion liability only among defendants). The district court's decision to treat the exchanges as the victims and calculate the

---

[6] To the extent there is an equitable concern that one-third of the restitution order would end up in Wiley's hands, the district court was informed that he "no longer has an ownership interest." Sent. Tr. at 6. No contrary evidence was presented.

losses based on the dishonored checks was within "the realm of permissible computations." *White*, 737 F.3d at 1142. We will not disturb the district court's decision to impose restitution under 18 U.S.C. § 3663A to make the exchanges whole.

Finally, the government suggests that we order a limited remand so the district court can correct what it deems a "scrivener's error." At Stein's re-sentencing on our earlier limited remand, the court calculated the loss amount at approximately $960,000 for the purposes of the guidelines, but ordered restitution for just over $1,000,000. Normally the loss amount and restitution award should be the same. However, after our review of the record, it is clear that this was not a scrivener's error, but was rather the result of conflicting factual findings. At the re-sentencing hearing, the district court agreed to reduce the loss amount by $209,000 because Stein had repaid that much to Jay Feldman, the owner of the Grand Avenue Currency exchange. Subtracting that amount from the previous total amount of the loss gave the $960,000 figure, which the district court used to calculate Stein's guideline range. Sent. Tr. at 22, 34. However, the district court had previously found that Feldman was only owed $166,812 in restitution, so the reduction in the loss amount for money paid to Feldman was more than what was owed to Feldman.[7] Judgment at 5–6. The

---

[7]   The value of all checks cashed at the Grand Avenue exchange that were dishonored was about $255,000. Before Stein was indicted, he agreed to repay that exchange. The district court determined that $90,000 in value had been given, resulting in the $166,812 figure in the first Judgment. At re-sentencing, the district court recognized about $209,000 *more* which had been given to Feldman. In total, the district court recognized almost

(continued...)

problem is that the total was not arbitrary—it was the sum of all restitution which the court had found was owed to various other financial institutions. *Id.* Accordingly, to reduce the total by more than Feldman was owed would result in reducing some victims' restitution below what the court had determined to be their loss. This would be an abuse of discretion. 18 U.S.C. § 3663A ("the court *shall* order … that the defendant make restitution to the victim of the offense" and "[t]he order of restitution *shall* require that such defendant … pay an amount *equal to …* the value of the property on the date of the … loss (emphases added)); 18 U.S.C. § 3664(f)(1)(A) ("In each order of restitution, the court *shall* order restitution to each victim in the *full amount of each victim's losses as determined by the court* and without consideration of the economic circumstances of the defendant" (emphasis added)); *see, e.g., United States v. Guy*, 335 F. App'x 898, 900 (11th Cir. 2009) (holding that "ordering [a defendant] to pay an amount of restitution less than the calculated amount of loss" was error, even where the victim was negligent (citing *United States v. Jones*, 289 F.3d 1260, 1265 (11th Cir. 2002)). The Amended Judgment entered by the district court reflected a correct totaling of the restitution which the court had found was due to the other financial institutions, resulting in a figure of $1,001,153. Am. Judgment at 5–6. Accordingly, in light of the conflicting findings, we will not disturb the correct calculation in the Amended Judgment to conform it to the erroneous one relied on to figure Stein's guideline range. Indeed, it may well have been clear error for

---

(…continued)
$300,000 in value given to Feldman for a loss of only about $255,000.

the district court to calculate the guidelines based on the incorrect loss amount derived from crediting Stein's overpayment of Feldman against other victims. But this worked to Stein's advantage and the government has not made this argument, so we leave things where they lie. *See, e.g.*, *Long-Gang Lin v. Holder*, 630 F.3d 536, 543 (7th Cir. 2010) ("The failure to adequately develop and support [an argument]" or, in this case, even make it "results in waiver."). Regardless, we thank the government for seeking to ensure that Stein received the credit that the district court seemed to be giving.

### III. Conclusion

The district court permissibly calculated the loss to the currency exchanges and ordered the appropriate amount of restitution. It was within the district court's discretion to decide that Wiley's misconduct did not relieve Stein of his responsibility to make the exchanges whole. Accordingly, we AFFIRM the judgment of the district court.